[Civ. No. 18657. Fourth Dist., Div. One. Jan. 14, 1980.]

In re JOSE P., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JOSE P., Defendant and Appellant.

---

**COUNSEL**

Appellate Defenders, Inc., under appointment by the Court of Appeal, and Stephen J. Perrello, Jr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Steven V. Adler and Gary W. Schons, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WORK, J.\***—Jose P., a minor nonresident alien, appeals his commitment to California Youth Authority (CYA) following a contested hearing resulting in a true finding to the charge of unlawful use of a motor vehicle, a felony (Veh. Code, § 10851). A maximum three-year term was aggregated with an additional one year previously suspended following an unrelated true finding of attempted commission of the same offense, a misdemeanor.

Appellant does not challenge the true finding on this appeal, but attacks his commitment to CYA, the imposition of the maximum term for the felony auto theft without specifications of reasons, the aggregating of the previously suspended misdemeanor term, and denial of precommitment credits of 25 days.

By its recent decision, *In re Eric J.* (1979) 25 Cal.3d 522 [159 Cal.Rptr. 317, 601 P.2d 549], the Supreme Court conveyed both good news and bad news to Jose. He will get credits for all precommitment confinement; he is not entitled to know why the referee imposed the maximum term. In addition, his consecutive term can only be one-third of one year, or four months.

Jose's two remaining contentions are more difficult to resolve.

*Factual background.*

Jose is a 15-year-old Mexican national whose legal residence is in Mexico. He first came to the attention of local juvenile authorities following an attempted auto theft, August 28, 1978. He admitted the offense as a misdemeanor, was made a ward of the court and placed on probation. Jose spent 26 days in custody and then was turned over to the immigration authorities.

Less than two months later, October 21, 1978, Jose again was apprehended illegally in this country stealing a car. This time he remained detained in juvenile hall until confinement in CYA.

Neither offense involved violence during the crime or apprehension. There is no indication of any misconduct by the minor during either period of custody.

---

*Assigned by the Chairperson of the Judicial Council.

The probation officer mentions the prior disposition and the present case and concludes "[t]his behavior indicates that the minor *probably* makes a living by committing thefts in the United States and then returning to Mexico to sell them." (Italics added.)

This speculation is the foundation for an opinion "...this indicates a certain degree of sophistication and causes him to be a danger to the community." The only facts from which this sophistication can be attributed to Jose is that he is a 15-year-old Mexican alien who bungled two car thefts.

The probation officer recommended CYA placement because of "his past and present offenses." Even though Jose had never been placed in any rehabilitation program, except being "floated" out of the country on his first contact, alternative treatments were expressly rejected, the officer reasoning: "...that in the past the Probation officer has committed several Mexican aliens to the Juvenile Ranch Facilities, all of whom have escaped. The majority of these have returned and committed additional offenses. Consequently, in order to protect the community from further criminal behavior, the Probation Officer feels that a CYA commitment is appropriate."

Although Jose's widowed mother allegedly resides in Tijuana, the current record shows no actual notice to her of any of the proceedings. She did not appear, nor was she represented at any of them. It is apparent she was not contacted by the probation officer during this social study, nor does his report indicate any familiarity with Jose's home environment, or any attempt to make any evaluation of it.

The social study suggests only two factors to justify the CYA recommendation:

1. This 15-year-old bungling auto thief is a sophisticated criminal and, therefore, a danger to the community: a. He is sophisticated because he "probably" makes a living by stealing in the U.S. and selling in Mexico; (i) (a) is indicated to be true because Jose is a Mexican alien; and/or

2. Jose is a Mexican alien; a. Several Mexican aliens have been committed to Juvenile Ranch Facilities, all of whom have escaped, and some of whom have committed more crimes. This compels the conclu-

sion; (i) Jose will escape from the Juvenile Ranch Facilities, and any other facility in which he is placed (except CYA) and will commit more crimes, therefore, (ii) He is a danger to the community.

The referee found Jose had proved unamenable to the previous orders of the court evidenced by his single illegal reentry and criminal act. No express reasons were given by the court as to why existing less punitive alternatives for placement were rejected. We assume, therefore, it relied on the probation officer's reasoning. The minor's custody was removed from his parent pursuant to section 726, subdivision (b), of Welfare and Institutions Code.[1]

■ *It is an abuse of discretion not to consider lesser restrictive placements before commitment to CYA even though the minor is a nonresident alien.*

If there is any theme which has been consistently and clearly expressed by the Legislature and the courts, it is that "'[j]uvenile commitment proceedings are designed for the purpose of rehabilitation and treatment, not punishment.'" (*In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65], quoted in *In re Eric J., supra,* 25 Cal.3d 522, 531.)

The difference between the punitive intent of criminal adult sentencing statutes and the nonpunitive design of the juvenile law sometimes results in the anomaly of longer custodial commitments for minors than for adults who commit the same crime. Such may be justified where the disparity meaningfully relates to rehabilitation of the juvenile.

Confinement in CYA is the most restrictive and most punitive of all dispositional options available to the court. It thrusts this 15-year-old

---

[1]In an effort to gain some insight into the nature of the prior admitted offense, we augmented the record on appeal by bringing up the entire lower court file. We find the probation officer erred in his description of the prior charged offenses as "attempted auto theft" and "auto theft." In fact, they were count one—attempted auto theft—and count two—*tampering with a vehicle, a misdemeanor.*

The current social study shows a true finding as to "auto theft." In fact, the finding was to "*attempted* auto theft," a misdemeanor. The record reveals no probation report was prepared in the previous case and it was handled in summary fashion.

No contact was ever made with any parent, and all letters were returned showing there was no such street in Tijuana as that to which they were mailed.

minor into custody, with adult offenders, and those having lengthy involvements in violent and illegal activity.[2]

Other restrictions imposed on a minor peculiar to a CYA commitment are outlined in *In re Arthur N.* (1976) 16 Cal.3d 226, 237-239 [127 Cal.Rptr. 641, 545 P.2d 1345].

"'[The legislative treatment plan designed for minors] contemplates a progressively restrictive and punitive series of disposition orders in cases. . . .'" (*In re Aline D., supra,* 14 Cal.3d 557, 564.)

Youth Authority placement should be deferred until lesser remedies of probation or other placements have failed or are clearly inappropriate. (*In re Michael R.* (1977) 73 Cal.App.3d 327, 335-336 [140 Cal. Rptr. 716].) This is so even though the offenses committed are serious and violent. (*In re Bryan* (1976) 16 Cal.3d 782, 788 [129 Cal.Rptr. 293, 548 P.2d 693] (murder one); *In re Lawrence B.* (1976) 61 Cal. App.3d 671 [132 Cal.Rptr. 599] (rape and kidnaping).)

When a minor is adjudged a ward, the court may make a disposition consistent with any alternative specified in sections 727, 730 and 731 of Welfare and Institutions Code. (Cal. Rules of Court, rule 1372.)

In ascending order of severity, there are:

(1) Any reasonable order;[3] (2) Supervision of the probation officer; (3) Commitment of the minor to the custody of a reputable person consenting thereto; (4) Award of custody to a public or private entity designed to care for minors, with the consent of the agency; (5) Custody, to the probation officer, to be placed in a foster home facility (Welf. & Inst. Code, § 727); (6) Commitment to a juvenile home, ranch camp or forestry camp; (7) Juvenile hall confinement (Welf. & Inst. Code, § 730); (8) All of the above plus orders for restitution and/or participation in uncompensated work programs; (9) Commitment to a sheltered care facility; (10) Commitment to CYA (Welf. & Inst. Code, § 731).

---

[2]In 1978, 41.8 percent of all *first commitments* to CYA were from adult courts; 42 percent were for violent offenses; 4.2 percent for sex offenses; 1 percent for arson; 1.5 percent for kidnaping; and 2.4 percent for narcotics and drugs. The average age of all first commitments was 17.4 years; 32 percent had five or more convictions or sustained petitions before first commitment. (Dept. of Youth Authority Annual Rep. (1978).)

[3]With such conditions for the parent to engage in joint counseling under the supervision of the probation officer as the court deems appropriate (Welf. & Inst. Code, § 727, subd. (1)(d)).

That the philosophy of the juvenile law is correctly expressed in *Aline D.* is confirmed by analogizing to the later enactment of rule 1391(b), California Rules of Court, relating to modifications of orders. Alternatives in ascending order of restrictiveness are listed as: (1) Placement in the home of the person having physical custody; (2) Placement in the home of a relative or friend; (3) Placement in a foster home; (4) Commitment to a private institution; (5) Commitment to a county institution; (6) CYA.

Although we are required to uphold the discretionary decision of the juvenile court if we can glean substantial evidence from the record to support it (*In re Richard W.* (1979) 91 Cal.App.3d 960, 984 [155 Cal.Rptr. 11]), we find none here. A single failure of prior probation where no supervision is afforded the minor as part of the probationary plan cannot justify disregard of less restrictive alternatives than CYA. The previous disposition was in the nature of a "floater." It was not designed to provide meaningful rehabilitative direction to Jose.

We can conceive of no reason for Jose being ordered to CYA on his first apprehension for the nonviolent offense without a social study except as an effort to deter him from reentering this country. Nor can we perceive, from the present record, any factors which would justify the court in not finding Jose suitable for a less punitive disposition than an aggregated four-year commitment to CYA other than his classification as a nonresident.

The social study candidly relies on Jose's alien status in making its recommendation. The referee decries such motivation but justifies his disposition on Jose's juvenile delinquency history.

The possibility Jose may escape from the ranch facility, based on an unsupported statement in the social study other Mexican aliens have done so, is not a rational basis to select the most punitive disposition. If the rehabilitation and treatment goals mean anything to juvenile placement, they must be tailored to the needs of the individual minor. Jose had never escaped. He was, in fact, detained in juvenile hall without apparent incident. No reason was given for rejecting a continued term in that facility (Welf. & Inst. Code, § 730).

Moreover, failure on a particular program, even on several, is not a ground for commitment to CYA. (*In re Aline D., supra,* 14 Cal.3d 557.)

(We do not read *In re Gregory S.* (1978) 85 Cal.3d 206 [149 Cal.Rptr. 216], or *In re John H.* (1978) 21 Cal.3d 18 [145 Cal.Rptr. 357, 577 P.2d 177], to which respondent cites us, as weakening the holding of *Aline D.* The egregious facts of those cases are significantly different from ours. Even *In re Darryl T.* (1978) 81 Cal.App.3d 874 [153 Cal.Rptr. 261], involving multiple robberies at knife-point and kidnaping, reversed a commitment to CYA.)

The record does not reveal the unavailability of suitable alternative dispositions. The court has great flexibility in making an order appropriate for the individual. None has ever been attempted for Jose.

Where a wardship is established for a minor whose residence is in a foreign country, the minor, if placed on probation, may be sent to an official of a juvenile court of such foreign country or an agency of such country authorized to accept the minor. (Welf. & Inst. Code, § 738.)[4]

No reason appears on the record why these provisions relating to nonresident wards were not available in this case. If in fact there are no facilities in Mexico to which the minor may be referred, this should be made clear. If there are available facilities but they àre inappropriate, the reasons should be stated.

Welfare and Institutions Code section 738 does not distinguish between those nonresident wards who are in this country legally and those illegally.

The attempt to portray Jose as a sophisticate in the world of crime is pure bootstrapping. The facts of the present offense show the minor spent one and a half to two hours unsuccessfully attempting to start the car until residents called the police to give him assistance. When the police arrived, he was hiding in the back seat. As a car thief, Jose appears as criminally sophisticated as a member of the "Apple Dumpling Gang."

There is no psychological or social evaluation of Jose or his family environment.

---

[4]For instance, the Mexican state of Jose's residence, Baja California, operates "La Granja," a facility for juveniles roughly equivalent to a combination juvenile hall and ranch. This is operated under the court system by El Tribunal para Menores. Imperial County, which like San Diego is proximate to the Mexican border, has a reciprocal relationship with the juvenile authorities in Baja California, to allow supervision over nonresident minors in appropriate cases.

Jose is young in relation to the average CYA committee, unsophisticated in the criminal sphere and has never been tried in any meaningful alternative program. No psychological study has been made.[5]

 *It is improper to aggregate a current CYA commitment with an unrelated previously suspended term unless sufficient advance notice is given to allow a fair opportunity to defend at the dispositional hearing.*

Failure to give a minor sufficient advance notice of the possibility a current disposition may also result in a more restrictive modification of a previous term is a denial of due process. It denies him a fair opportunity to defend. (*In re Richard W., supra,* 91 Cal.App.3d 960, 977, mod. at 93 Cal.App.3d 1010e; *In re Robert S.* (1979) 92 Cal.App.3d 355, 362-363 [154 Cal.Rptr. 832].)

Where, as here, a new Welfare and Institutions Code section 602 petition has been filed, it is not necessary to file a supplemental petition under section 777 in order to modify or change a previous disposition (*In re Ruben M.* (1979) 96 Cal.App.3d 690, 700 [158 Cal.Rptr. 197]), so long as the requisite notice required by California Rules of Court, rule 1391, is afforded the minor and his parents. This may be by recitation in the social study. (*In re John G.* (1977) 72 Cal.App.3d 242, 246 [139 Cal.Rptr. 849].) Such notification would be at least 48 hours in advance of the dispositional hearing. (Welf. & Inst. Code, § 280; Cal. Rules of Court, rule 1371(b).)

Respondent distinguishes the present case from those which require notice as one involving only a pro forma "activation" of a suspended commitment to CYA. This "activation" is in reality a revocation of probation resulting in a commitment which is aggregated to a maximum term already given for a new offense.

There is no exception to notice requirements where a change of disposition results in a more restrictive term as a result of modification of probation. (*In re Glenn K.* (1977) 74 Cal.App.3d 342, 345-346 [141 Cal.Rptr. 486].)

Respondent contends we should adopt a rule requiring a minor to show a reasonable probability a different disposition would have been

---

[5]If the court was concerned about security, a temporary placement at CYA for such a study was available pursuant to Welfare and Institutions Code section 704.

reached had he been given notice. We are cited to no authority for this approach. We recognize this standard is applied where an admission of culpability is given without full advice of the possible consequences of aggregating terms. (*In re Ronald E.* (1977) 19 Cal.3d 315, 325 [137 Cal.Rptr. 781, 562 P.2d 684].) Thus, a waiver of jurisdictional hearing will not be set aside where a review of the record shows the improbability of a different factual finding after a full evidentiary hearing.

While potential aggregating of terms may be only a collateral consequence of an admission of culpability at the jurisdictional stage, it is directly related to the dispositional phase. It is not appropriate for us to speculate as to what factors may have been brought out in appellant's favor had he been advised of potential aggregation before the final hearing.

The commitment order is reversed. The case is remanded for a new disposition hearing at which the suitability of Jose as an individual for less restrictive alternative placement shall be considered.

If aggregation of terms is to be again considered, notice of such shall be given in terms sufficient to advise the minor and his parent of all facts which are to be relied on to support a change in the probationary status of his previous disposition.

Cologne, Acting P. J., and Wiener, J., concurred.

A petition for a rehearing was denied February 13, 1980, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied March 13, 1980.